UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DORILTON CAPITAL MANAGEMENT LLC and
WILLIAMS IP HOLDINGS LLC,

*Plaintiffs*,

v.

STILUS LLC and CLAUDIA SCHWARZ,

*Defendants*.

Case No. 23-cv-3789

**COMPLAINT**

---

Plaintiffs Dorilton Capital Management LLC ("Dorilton") and Williams IP Holdings LLC ("WIPH") (collectively, "Plaintiffs"), by and through their undersigned counsel, bring this action against Stilus LLC ("Stilus") and Claudia Schwarz ("Schwarz") (collectively, "Defendants"), and allege as follows:

## NATURE OF THE ACTION

1.      From February 2021 to March 2023, Defendants orchestrated and executed a fraudulent scheme to overbill and improperly charge Plaintiffs for over $6.9 million dollars.  As part of Defendants' scheme, Schwarz ingratiated herself with Plaintiffs' senior management and entered into an inappropriate relationship with Dorilton's former CEO, inducing him to approve lucrative contractual agreements for Schwarz and her companies to provide public relations and marketing services to affiliates of the Williams Grand Prix Engineering Limited ("WGPE") Formula One team.  Once those contracts were in place, Defendants submitted inaccurate and overinflated invoices and improper credit card charges seeking compensation for, among other things, services that were never actually performed, work product that was never approved, and travel expenses that lacked proper approval or otherwise violated Plaintiffs' travel policy.

Schwarz used her personal relationship with Dorilton's former CEO to conceal her scheme and mislead Plaintiffs.

2.      At the same time she was extracting millions of dollars from Plaintiffs, Schwarz engaged in unprofessional and egregious conduct on a near-daily basis, creating a toxic workplace culture and terrorizing staff.  Schwarz and her company Stilus also delivered substandard work product and engaged in misconduct that significantly damaged Plaintiffs' reputation.  As set forth further herein, Defendants' conduct breached numerous provisions of Defendants' contractual agreements with Plaintiffs.

3.      Plaintiff Dorilton, through its affiliates, is the owner of WGPE.  Plaintiff WIPH manages marketing and sponsorship for WGPE.

4.      Dorilton terminated its contractual relationship with Defendants in November 2022 due to, among other things, the extensive unprofessional conduct by Schwarz and the fact that Defendants' work product failed to meet the highest professional standard as agreed to in the contract.  After terminating the Dorilton contract, Plaintiffs commenced an audit of the millions of dollars billed and charged by Stilus, and Defendants were unable to provide supporting documentation or the necessary approvals for over $6.9 million dollars in fees and expenses.  In March 2023, following completion of the audit and Defendants' failure to sufficiently support the challenged fees and expenses, WIPH terminated its contractual relationship with Defendants. Plaintiffs bring this action to seek recovery of those overbilled and improperly charged fees and expenses, their costs associated with the audit, as well as other damages suffered as a result of Defendants' actions.

5.      Defendants' actions reflected a clear and knowing intent to perpetrate a fraud against Plaintiffs in order to wrongfully obtain millions of dollars to which they were not

entitled, and to take whatever means necessary to keep the fraudulent scheme concealed for as long as possible.

6.      Plaintiffs have suffered economic harm as well as irreparable harm to their goodwill, reputation, brand, and business relationships as a result of Defendants' actions.  WGPE is a historic, well-regarded racing company with a passionate worldwide fanbase.  The actions of Defendants jeopardized WGPE's global standing and reputation with its fans and the broader Formula One community.  Accordingly, Plaintiffs seek recourse from this Court to remedy the harm caused by Defendants' actions.

7.      Plaintiffs bring this action to recover compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.  Plaintiffs further seek a declaration that all agreements between Plaintiffs and Defendants have been terminated and that no additional monies are due to Defendants as a result of their breaches.

## THE PARTIES

8.      Plaintiff Dorilton Capital Management LLC is a limited liability company organized under the laws of Delaware and headquartered in New York, New York.

9.      Plaintiff Williams IP Holdings LLC is a limited liability company organized in the Republic of the Marshall Islands with a business address in Hamilton, Bermuda.

10.     Defendant Stilus LLC is a limited liability company organized under the laws of Delaware with a business address in Aventura, Florida.

11.     Defendant Claudia Schwarz is a German citizen who founded and controls several companies including Stilus, and maintains residences in Florida, Bermuda, and Germany.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332.  The amount in controversy exceeds $75,000 and complete diversity of citizenship

between Plaintiffs and Defendants exists.  This Court has pendant jurisdiction over the accompanying state law claims pursuant to 28 U.S.C. § 1367.

13.     This Court has personal jurisdiction over Defendants because they transacted business in the state through their systematic and continuous business dealings with Plaintiffs and because each of the Defendants has committed a tortious act either within the state or without the state causing injury to person or property within the state.  Among other things, Defendants submitted their fraudulent invoices to Plaintiffs in New York for payment. Defendants therefore expected or should have reasonably expected their tortious acts to have consequences in the state and they derived substantial revenue from interstate or international commerce.  In addition, Defendant Stilus has consented to this Court's sole and exclusive jurisdiction.

14.     Venue is proper in the Southern District of New York (the "District") pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to this action occurred in this District.  In addition, Defendant Stilus has consented to New York, New York as the sole and exclusive venue for this dispute.

## FACTUAL ALLEGATIONS

**A.    Dorilton Capital Management Acquires WGPE And Seeks To Reinvigorate The WGPE Brand**

15.     Plaintiff Dorilton is a private investment firm that invests in businesses across various industries.

16.     WGPE is a Formula One ("F1") racing team with a prestigious past.  WGPE has historically been one of the most successful teams in F1, dominating the sport in the 1980s and 1990s.

17.     Dorilton, through its affiliated entities, acquired WGPE on August 21, 2020 with the goal of re-establishing the success of the WGPE team and reinvigorating the brand.  With Dorilton's backing, this was an opportunity for WGPE to reintroduce itself to the world of F1 racing.

18.     Part of Dorilton's strategy following the WGPE acquisition was to hire best-in-class marketing professionals.

19.     Jost Capito was appointed CEO of WGPE in December 2020 and later became team principal in June 2021.

20.     Capito introduced Dorilton and WGPE to Schwarz shortly after Capito was appointed CEO.  While Schwarz did not have any prior experience working in F1, Schwarz held herself out to Plaintiffs as an experienced marketing consultant and the founder, owner, and CEO of two marketing agencies—Defendant Stilus and Instyle Productions GmbH ("Instyle").

21.     Dorilton's CEO at the time was Darren Fultz.  Part of Fultz's responsibilities at Dorilton involved overseeing the WGPE investment—including advising on the selection of marketing vendors and the approval of marketing expenses.

22.     Schwarz proceeded to insidiously cultivate a close personal relationship with Fultz, which at some point devolved into an unprofessional and inappropriate personal relationship.

**B.     Schwarz Leverages Her Connections To Secure Contracts With WGPE, Dorilton, and WIPH**

23.     Between February 2021 and March 2022, Schwarz leveraged her personal relationships with Capito and Fultz to cause Dorilton, WIPH, and WGPE to enter into contracts with her company Stilus.  Schwarz used the contracts with Stilus to illegally extract millions of dollars from Plaintiffs.

### i.   Stilus Contracts With WGPE

24.    In February 2021, WGPE entered into a Public Relations Consultancy Agreement with Stilus (the "WGPE Agreement").

25.    In the WGPE Agreement, Stilus (and Schwarz as CEO of Stilus) agreed to provide "public relations services, brand building, and image and market exposure strategies" to WGPE.  (WGPE Agreement at 1.)

### ii.   Stilus Contracts With Dorilton

26.    In November 2021, Schwarz influenced Capito and Fultz to fire the then-Chief Marketing Officer ("CMO") of WGPE and install Schwarz as the interim CMO.  This meant that Schwarz was now responsible for overseeing the work that the outside agencies she controlled—Stilus and Instyle—performed for WGPE.  As interim CMO, Schwarz reported to Capito with a dotted line reporting relationship to Fultz.  Fultz was based in New York City at all relevant times.

27.    It was understood that Schwarz would hold the interim CMO position on a temporary basis while she assisted WGPE in hiring a permanent CMO.  Schwarz, however, took no action to identify CMO candidates for WGPE.  By keeping the CMO role for herself, Schwarz was able to continue to secure a steady stream of work for her companies and ensure that her overbilling scheme remain undetected.

28.    On March 10, 2022, Dorilton entered into a Consulting Agreement with Stilus, with an effective date of November 1, 2021 (the "Dorilton Agreement").  The Dorilton Agreement permitted Schwarz to utilize the services of Stilus in connection with fulfilling her duties as interim CMO, thus allowing Schwarz to capitalize further by billing Dorilton for work that should have been performed by Dorilton or WGPE employees.

29.     Section 1 of the Dorilton Agreement required Stilus to complete its services "at the direction of Company" and "in good faith and in a manner compliant with best industry practices and that promoted Company's and its Affiliates' brands and images of quality, prestige, and integrity."

30.     Similarly, in Section 8(a) of the Dorilton Agreement, Stilus represented and warranted that it would "render the Services in accordance with the highest professional standards."

31.     Section 3(a) of the Dorilton Agreement set forth the requirements for approval of invoices and expenses.  Stilus was required to submit invoices on a monthly basis with itemized and detailed expenses.  The Dorilton Agreement required that "[a]ll expenses must be approved in advance" by a designated officer at Dorilton.  All invoices were required to be "itemized and submitted in detail to" the designated individuals, who were located in New York.

32.     Section 4 of the Dorilton Agreement provided that Dorilton has the right "to review, or have its agent review, Consultant's books and records as they pertain to the Services." The Dorilton Agreement also required Stilus to "maintain accurate and complete records related to fees and expenses charged to the Company" and "in such a manner as may be readily audited" by Dorilton.

### iii.     Stilus Contracts With WIPH

33.     In or around October 2021, Dorilton transferred certain assets from WGPE to WIPH.

34.     To ensure that she would be able to continue to profit off of her relationships, Schwarz pushed for Stilus to contract with WIPH.

35.     On January 1, 2022, WIPH and Stilus executed a Public Relations Consultancy Agreement (the "WIPH Agreement").

36.     Section 3.1 of the WIPH Agreement required Stilus to perform its services "with reasonable skill and care, to a standard to be reasonably expected from a competent and professional supplier of public relations services."  Indeed, in Sections 3.2.1 and 3.2.2 of the WIPH Agreement, Stilus agreed to "work diligently to protect and promote the interests of the Client at all times" and to act "loyally and faithfully towards the Client in all matters."

37.     Section 6.3 of the WIPH Agreement provided that "expenses, including . . . travel, accommodation and subsistence" must be "in accordance with the Client's travel policy."

38.     Section 8.1 of the WIPH Agreement required Stilus to obtain "prior written approval" from WIPH of all work product.

39.     Section 18.1 of the WIPH Agreement required Stilus to "abide by the highest professional behaviour during the whole term of th[e] Agreement."

40.     A key part of Stilus's role was to interact with members of the media and generate positive press engagements for WGPE.  Section 3.2.3 of the WIPH Agreement required Stilus to "advise the Client of all its key meetings, discussions and correspondence with representatives of the media concerning the Client."

41.     Section 2 of the WIPH Agreement required Stilus to submit "Proposals" detailing each campaign that Stilus planned to execute.

42.     Section 12 of the WIPH Agreement contained an audit provision.  It required Stilus to keep records of all reimbursable expenses so that WIPH could verify and inspect them if necessary.  Stilus agreed to maintain records of its expenditures under the WIPH Agreement for

a period of five years, and authorized WIPH to inspect its records and other relevant data.  Stilus

was required to reimburse WIPH immediately for any overpayments:

> "In the event such inspection reveals an overpayment [Stilus] shall immediately
> account to the Client for any such overpayment.  In the event such inspection
> reveals an overpayment of five per cent (5%) or more [Stilus] shall also reimburse
> the Client for the costs of such an inspection."

43.     After the parties executed the WIPH Agreement, Stilus—at the direction and with

the approval of Schwarz—submitted various "Proposals."  One such Proposal was "Quote

1299."  Quote 1299 was a statement of work that detailed the particular services Stilus would

perform for Plaintiffs and their affiliates on a monthly basis and the amounts Defendants would

charge Plaintiffs for completing such services.

44.     Upon information and belief, Schwarz drafted all of the agreements between

Stilus and each of Dorilton, WGPE, and WIPH, and utilized her inappropriate relationship with

Fultz to induce Fultz to cause Dorilton, WGPE, and WIPH to enter into the agreements as

presented by Schwarz and without any review or negotiation.

### iv.     Defendants Worked Closely With Plaintiffs' New York-Based Employees

45.     Once the agreements were in place, Schwarz and her team at Stilus worked

closely with employees of Plaintiffs who were based in New York.  Schwarz reported to Fultz,

who was based in New York.  Schwarz and Fultz, in particular, communicated on a regular basis

and sometimes communicated multiple times each day.  Schwarz also flew to New York to

attend meetings with Plaintiffs' employees, and during those visits she would meet with Fultz

privately.

46.     Defendants also worked closely with Aidan Lyons, Chief Growth Officer of

WIPH, and his team, who were all based in New York.  Lyons's fan engagement team and

Schwarz's marketing team planned and executed initiatives as one unit.  Because of the

connected nature of their departments, Schwarz and Lyons communicated on an almost-daily basis, and Schwarz would regularly travel to the company's New York City offices to meet with Lyons and his team.

**C.    Schwarz Creates A Toxic Workplace Environment And Causes Multiple Employees To Leave WGPE**

47.     From the start of Schwarz's business relationship with Defendants in February 2021 until the end of the relationship in March 2023, Schwarz created a toxic work environment at WGPE, with multiple employees reporting experiences of extreme harassment and bullying by Schwarz.

48.     Several employees filed formal complaints with Human Resources and numerous valued employees reported that they left the company due to Schwarz's behavior and the destructive workplace culture she created.

49.     Employees reported that Schwarz displayed "sociopathic" and "narcissistic" tendencies, which these employees said resulted in a significant decline in workplace culture and created a work environment of fear and blame.  The employee complaints cited hostility, bullying, obsessive lying, manic communication, manipulation, verbal threats, and ongoing harassment by Schwarz.

50.     Schwarz would often yell for no reason, and regularly threatened junior employees that they were on the verge of being fired—without any truth to the claim—as a means of controlling employees and instilling fear.

51.     A senior executive at WGPE who worked closely with Schwarz described her as a bully who would pit people against each other with intimidation tactics.

52.     In a scene reminiscent of the movie "*The Devil Wears Prada*," Schwarz once unleashed on her personal assistant, screaming at her because Schwarz could not bring her dogs into the cabin of a commercial plane for a flight from Miami to London.

53.     When she was not terrorizing people, Schwarz would completely disappear.  She was often unreachable, and there were numerous occasions when important decisions could not be made and significant delays occurred because nobody could find Schwarz and Schwarz refused to allow others to make decisions in her absence.

54.     Schwarz often worked from her homes in Germany, Bermuda, and Miami rather than from WGPE's offices in England.  As a result, Schwarz operated in different time zones than the rest of the WGPE team.  Numerous WGPE employees noted that Schwarz regularly contacted them outside work hours, including with incessant phone calls at all hours of the night.

55.     On the rare occasions when Schwarz was present in person at the WGPE offices in England, Schwarz intentionally excluded many employees from dinners and events which created an "us versus them" culture.

56.     Schwarz also made sure to funnel work to vendors with whom she had a personal or intimate connection, such as her husband Axel Ludwig.  Schwarz insisted on using Ludwig as a vendor for various projects, despite his exorbitant fees and limited qualifications.

## D.     Schwarz And Stilus Perform Their Duties In An Unsatisfactory Manner And Create Sub-Standard Work Product

57.     Despite Schwarz promoting herself and Stilus to Defendants as a premier marketing firm that could transform the WGPE brand, Defendants' work product over the course of the business relationship fell far short of professional standards.

58.     One of the key responsibilities of Defendants was to design and execute numerous marketing and brand campaigns.  The centerpiece of these efforts was a video-based campaign

called "Beyond Racing," which aimed to engage with fans by displaying a behind-the-scenes look at WGPE. When Schwarz and Stilus shared the completed campaign, WGPE employees were shocked at the poor quality of the work. WGPE executives stated that they felt the content was unusable because it was incredibly "off-brand" for the company and, despite costing an exorbitant amount of money to produce, presented like a low-level or amateur production.

59.     Although there were attempts made to question the cost of these campaigns and the amounts being charged by Stilus, Schwarz told employees that she had direct support from Fultz for such expenses. Schwarz designed and perpetuated a culture in which employees were unable to question the unreasonable costs that Stilus was charging for its work out of fear that Schwarz would use such allegations to have Fultz fire them. Schwarz did so in order to ensure that Stilus could continue overbilling Plaintiffs for its services.

60.     Schwarz and Stilus were also assigned to produce a marketing campaign aimed at the American market, to enhance engagement with fans in the United States. Schwarz and Stilus dubbed this brand campaign "Across the Pond." When "Across the Pond" was shown internally at WGPE, multiple WGPE executives went directly to senior management to raise concerns about the videos, stating that the terrible quality of the videos would make them the laughingstock of the industry. Notwithstanding the subpar quality of the "Across the Pond" videos, Stilus charged WGPE hundreds of thousands of dollars for producing just one of the videos in the campaign. A WGPE communications executive noted that this cost was well above market rate, particularly for a video of such low quality.

61.     WGPE executives who reviewed the "Across the Pond" campaign had overwhelmingly negative responses. Executives recall being fearful of losing a segment of their fan base due to potential damage to the racing brand. On the commercial side, another WGPE

executive explained that because campaigns such as Beyond Racing and "Across the Pond" were so inconsistent with the broader fan engagement strategies being employed, they risked undermining years of brand-building work.

### E.   Dorilton Terminates Schwarz As Interim CMO And Terminates The Dorilton Agreement With Stilus

62.     Although Schwarz exploited her role as interim CMO and her personal relationship with Fultz to conceal her fraudulent scheme, she could not conceal the fact that she was failing to effectively perform her role as CMO and that Stilus was generating shoddy work product.

63.     On November 9, 2022, Dorilton informed Fultz that it was terminating his employment as CEO.

64.     On November 23, 2022, Schwarz's role as interim CMO of WGPE was terminated.

65.     On November 28, 2022, Dorilton served Stilus with notice that it was terminating the Dorilton Agreement effective November 23, 2022.

### F.   After Her Termination, Schwarz Participates In A *Forbes* Magazine Article Without Authorization

66.     On December 8, 2022, *Forbes* published an article titled "F1's Williams Racing Team Redefines the Startup Culture at 200 MPH."  In the article, numerous quotes are attributed to Schwarz.  Schwarz did not receive approval from WGPE or WIPH to communicate with *Forbes* for this article.  This was a clear violation of Section 3.2.3 of the WIPH Agreement, which states that Stilus agrees "to advise the Client of all its key meetings, discussions and correspondence with representatives of the media concerning the Client."

67.     In addition, Schwarz made misleading statements to *Forbes*.  The article stated that Schwarz was responsible for newfound marketing success for WGPE, specifically

referencing the poorly executed "Beyond Racing" marketing campaign led by Schwarz.

Quotations attributed to Schwarz suggested that "Beyond Racing" was considered successful and

in line with WGPE's desired branding, and that it was still being pursued.  None of this was true:

The campaign designed by Schwarz received a very poor reception internally, with executives

citing it as contrary to the WGPE brand, wasteful of resources, of poor quality, and ultimately

unusable.

**G.     Stilus Created Low Quality Marketing Campaigns And Posted Social Media Content
          That Negatively Affected WGPE's Reputation**

68.     In or around January 2023, Lyons and his team initiated an idea to create video

content around the "Untold Story" of WGPE.  The idea was to feature video content of the on-

track and off-track work being done by WGPE.  Lyons and his team discussed the idea at a

senior management meeting that Schwarz attended as CEO of Stilus.  After discussing the idea at

the meeting, Plaintiffs signed off on moving forward with developing the project and Defendants

would play a key role in capturing and creating the content.

69.     The expectation was that Defendants would present their work product internally

and, as required for projects of this nature, obtain sign off from key internal stakeholders before

the campaign went live.

70.     On February 22, 2023, Stilus posted an image on WGPE's official social media

accounts.  The post was a promotional image for a Stilus-created marketing campaign called

"Untold Story."  Defendants did not obtain proper internal clearance at WGPE for the

promotional image before it was posted, including from the legal department.

71.     Shortly after the image was posted on social media, a representative of F1

contacted WGPE, raising his concerns that the "Untold Story" video campaign was entirely

inappropriate and infringed the intellectual property rights of a third party.  WGPE was instructed to immediately remove the post.

72.     On February 23, 2023, one day after Stilus posted the "Untold Story" campaign on social media, F1 issued new social media guidelines that applied to all F1 teams.  A number of F1 teams reached out to WGPE to blame WGPE for the new guidelines, which were seen as more restrictive to all F1 teams.  Defendants' conduct thus directly harmed WGPE's reputation with the other F1 teams, and hamstrung WGPE's social media marketing strategy going forward.

**H.     Plaintiffs Discover That Defendants Submitted Unsupported, Inflated, And False Invoices**

73.     On January 20, 2023, Plaintiffs informed Schwarz that they had decided to exercise their contractual rights to engage in an audit of Stilus's invoices and charges to a company credit card.

74.     Dorilton's audit team spent over a month analyzing all available records and documentation related to Stilus, its work product, its invoices, and its expenses.

75.     The audit team reviewed each and every invoice and credit card charge that Defendants submitted and found that dozens of invoices and credit card charges contained fees and expenses that lacked sufficient support to evidence the accuracy of the fees and expenses, contained fees and expenses for which Defendants failed to obtain the required pre-approval, and/or contained travel expenses that were either not authorized or in contravention of applicable travel policies.

76.     After the audit team reached its preliminary findings, the team contacted Defendants to request additional information.  Over the next several weeks, Schwarz was provided detailed lists of invoices, missing information, and missing documentation which were

being requested in connection with the audit.  Schwarz and her team were not fully cooperative during the audit, and failed to provide sufficient assistance or the requested documentation.

77.     Ultimately, based on Defendants' failure to provide evidence to support the fees and expenses charged to Plaintiffs, the audit team determined that Defendants overbilled, over-expensed, and improperly charged Plaintiffs in an amount that exceeded $6.9 million.

78.     ***Missing Support***:  The audit revealed that 57 Stilus invoices contained fees and expenses that did not have sufficient records or documentation to substantiate the actual hours spent by Defendants in performing work for Plaintiffs, that the invoiced work was actually performed, or that the expenses reflected were accurate.  The missing documentation included timesheets for Stilus employees, invoices from third-party providers that Stilus used for various campaigns, and receipts for expenses like supplies and vendors.  The unsupported fees and expenses totalled over $6.8 million.

79.     The chart below identifies each invoice containing fees and expenses that lacked appropriate support.  Despite repeated requests from the audit team, Defendants did not provide adequate evidence or documentation for the fees and expenses contained in the invoices set forth below.

| Missing Support | | | | |
|---|---|---|---|---|
| No. | Vendor | Invoice | Date | Amount |
| 1. | STILUS LLC | 1012 | 02/26/21 | $110,600.00 |
| 2. | STILUS LLC | 1022 | 02/26/21 | $115,325.00 |
| 3. | STILUS LLC | 1013 | 03/31/21 | $249,400.00 |
| 4. | STILUS LLC | 1023 | 03/31/21 | $90,650.00 |
| 5. | STILUS LLC | 1024 | 04/30/21 | $95,720.00 |
| 6. | STILUS LLC | 1014 | 04/30/21 | $181,400.00 |

| Missing Support | | | | |
|---|---|---|---|---|
| No. | Vendor | Invoice | Date | Amount |
| 7. | STILUS LLC | 1030 | 05/11/21 | $6,050.00 |
| 8. | STILUS LLC | 1015 | 05/28/21 | $256,970.00 |
| 9. | STILUS LLC | 1025 | 05/28/21 | $90,650.00 |
| 10. | STILUS LLC | 1031 | 06/24/21 | $14,700.00 |
| 11. | STILUS LLC | 1033 | 06/24/21 | $300,114.00 |
| 12. | STILUS LLC | 1032 | 06/24/21 | $202,837.86 |
| 13. | STILUS LLC | 1026 | 07/01/21 | $160,650.00 |
| 14. | STILUS LLC | 1011_2021 | 07/30/21 | $59,500.00 |
| 15. | STILUS LLC | 1033-4 | 08/09/21 | $23,355.21 |
| 16. | STILUS LLC | 1027 | 08/15/21 | $90,650.00 |
| 17. | STILUS LLC | 1033-2 | 08/24/21 | $350,133.00 |
| 18. | STILUS LLC | 1029 | 10/06/21 | $160,650.00 |
| 19. | STILUS LLC | 1038 | 10/16/21 | $10,720.00 |
| 20. | STILUS LLC | 1036 | 10/18/21 | $21,940.00 |
| 21. | STILUS LLC | 1035 | 10/18/21 | $9,280.00 |
| 22. | STILUS LLC | 1037 | 10/18/21 | $9,280.00 |
| 23. | STILUS LLC | 1033-3 | 11/04/21 | $350,133.00 |
| 24. | STILUS LLC | 1080_2021 | 11/10/21 | $10,220.00 |
| 25. | STILUS LLC | 1044 | 11/22/21 | $10,795.00 |
| 26. | STILUS LLC | 1046 | 11/22/21 | $11,495.00 |
| 27. | STILUS LLC | 1045 | 11/25/21 | $6,183.60 |
| 28. | STILUS LLC | 1050 | 12/20/21 | $11,495.00 |
| 29. | STILUS LLC | 1048 | 12/20/21 | $34,485.00 |
| 30. | STILUS LLC | 1049 | 12/20/21 | $11,495.00 |
| 31. | STILUS LLC | 1052 | 12/20/21 | $90,650.00 |

| | Missing Support | | | |
|---|---|---|---|---|
| No. | Vendor | Invoice | Date | Amount |
| 32. | STILUS LLC | 1051 | 12/20/21 | $160,650.00 |
| 33. | STILUS LLC | 1055 | 12/23/21 | $186,500.00 |
| 34. | STILUS LLC | 1054 | 02/07/22 | $90,650.00 |
| 35. | STILUS LLC | 1055-2022 | 02/15/22 | $290,650.00 |
| 36. | STILUS LLC | 1056-2022 | 02/16/22 | $290,650.00 |
| 37. | STILUS LLC | 1057-2022 | 02/28/22 | $11,450.00 |
| 38. | STILUS LLC | 1055/2022 | 03/04/22 | $160,650.00 |
| 39. | STILUS LLC | 001-2022 | 03/14/22 | $145,850.00 |
| 40. | STILUS LLC | 1059-2022 | 04/07/22 | $5,911.39 |
| 41. | STILUS LLC | 002-2022 | 05/03/22 | $29,620.00 |
| 42. | STILUS LLC | 1060-2022 | 05/10/22 | $119,741.67 |
| 43. | STILUS LLC | 1061-2022 | 05/10/22 | $119,741.67 |
| 44. | STILUS LLC | 1059_2022 | 05/19/22 | $735.00 |
| 45. | STILUS LLC | 1062-2022 | 06/10/22 | $119,741.67 |
| 46. | STILUS LLC | 003-2022 | 06/24/22 | $81,590.59 |
| 47. | STILUS LLC | 1063-2022 | 07/05/22 | $290,650.00 |
| 48. | STILUS LLC | 1064-2022 | 07/19/22 | $119,741.67 |
| 49. | STILUS LLC | 1065-2022 | 08/19/22 | $119,741.67 |
| 50. | STILUS LLC | 1069-2022 | 10/04/22 | $119,741.67 |
| 51. | STILUS LLC | 1070-2022 | 10/10/22 | $290,650.00 |
| 52. | STILUS LLC | 1071-2022 | 10/12/22 | $119,741.67 |
| 53. | STILUS LLC | 1072-2022 | 11/03/22 | $290,650.00 |
| 54. | STILUS LLC | 1073-2022 | 11/04/22 | $119,741.67 |
| 55. | STILUS LLC | 1076-2022 | 12/01/22 | $119,741.67 |
| 56. | STILUS LLC | 1077-2022 | 12/01/22 | $119,741.67 |
| 57. | STILUS LLC | 1078-2023 | 01/03/23 | $119,741.67 |
| TOTAL | | | | $6,801,542.02 |

80.    ***Unsigned and/or Missing Approval***:  Despite the fact that the WGPE Agreement

and the WIPH Agreement required that any specific projects Stilus wanted to undertake be set

forth in a documented proposal that was agreed to and signed by the parties, Defendants

submitted over two dozen invoices containing charges for work and services that Plaintiffs never

approved.  Specifically, 27 invoices submitted by Defendants, with a value of over $1.8 million

are missing the contractually-required pre-approvals for the services allegedly performed.

81.    The chart below identifies each invoice that was missing a required approval.

| No Pre-Approval[1] | | | | |
|---|---|---|---|---|
| **No.** | **Vendor** | **Invoice** | **Date** | **Amount** |
| 1. | STILUS LLC | 1030 | 05/11/21 | $16,050.00 |
| 2. | STILUS LLC | 1031 | 06/24/21 | $14,700.00 |
| 3. | STILUS LLC | 1033 | 06/24/21 | $300,114.00 |
| 4. | STILUS LLC | 1032 | 06/24/21 | $202,837.86 |
| 5. | STILUS LLC | 1011_2021 | 07/30/21 | $59,500.00 |
| 6. | STILUS LLC | 1033-4 | 08/09/21 | $23,355.21 |
| 7. | STILUS LLC | 1033-2 | 08/24/21 | $350,133.00 |
| 8. | STILUS LLC | 1038 | 10/16/21 | $10,720.00 |
| 9. | STILUS LLC | 1036 | 10/18/21 | $21,940.00 |
| 10. | STILUS LLC | 1035 | 10/18/21 | $9,280.00 |
| 11. | STILUS LLC | 1037 | 10/18/21 | $9,280.00 |
| 12. | STILUS LLC | 1033-3 | 11/04/21 | $350,133.00 |

---

[1] Because certain invoices submitted by Defendants included charges that did not have sufficient support and charges that did not have proper approval, certain invoices appear in this No Pre-Approval chart as well as in the Missing Support chart above.  The total amount of over $6.9 million in overbilled and improperly charged fees and expenses discussed throughout this Complaint represents the total net figure and no charges have been double counted.

| No Pre-Approval[2] | | | | |
|---|---|---|---|---|
| No. | Vendor | Invoice | Date | Amount |
| 13. | STILUS LLC | 1080_2021 | 11/10/21 | $10,220.00 |
| 14. | STILUS LLC | 1044 | 11/22/21 | $10,795.00 |
| 15. | STILUS LLC | 1046 | 11/22/21 | $11,495.00 |
| 16. | STILUS LLC | 1045 | 11/25/21 | $6,183.60 |
| 17. | STILUS LLC | 1050 | 12/20/21 | $11,495.00 |
| 18. | STILUS LLC | 1048 | 12/20/21 | $34,485.00 |
| 19. | STILUS LLC | 1049 | 12/20/21 | $11,495.00 |
| 20. | STILUS LLC | 1053 | 01/28/22 | $1,595.49 |
| 21. | STILUS LLC | 1056_2022 | 03/21/22 | $1,000.00 |
| 22. | STILUS LLC | 1059-2022 | 04/07/22 | $5,911.39 |
| 23. | STILUS LLC | 1059_2022 | 05/19/22 | $735.00 |
| 24. | STILUS LLC | 1066-2022 | 08/31/22 | $6,410.72 |
| 25. | STILUS LLC | 1070-2022 | 10/10/22 | $290,650.00 |
| 26. | STILUS LLC | 1074-2022 | 11/09/22 | $110,194.04 |
| 27. | STILUS LLC | 1075-2022 | 11/23/22 | $7,582.24 |
| **TOTAL** | | | | **$1,888,290.55** |

82.    ***Travel Expenses***:  The WGPE Agreement and the WIPH Agreement also specifically stated that all travel expenses Stilus charged to Plaintiffs must comply with Plaintiffs' travel policies, and the Dorilton Agreement provided that Stilus was responsible for obtaining written approval from Plaintiffs for travel expenses.  Yet Defendants submitted 24 invoices to Plaintiffs that included over $29,000 worth of travel expenses for which Defendants

---

[2] Because certain invoices submitted by Defendants included charges that did not have sufficient support and charges that did not have proper approval, certain invoices appear in this No Pre-Approval chart as well as in the Missing Support chart above.  The total amount of over $6.9 million in overbilled and improperly charged fees and expenses discussed throughout this Complaint represents the total net figure and no charges have been double counted.

never received pre-approval or that violated Plaintiffs' travel policy.  In addition, Defendants completed 37 travel expense-related charges on a company credit card that lacked sufficient approval or violated travel policy.  The improper credit card charges totalled over $18,000, and combined with the improperly invoiced travel expenses, Defendants' improper travel expenses totalled over $47,000.

83.   The chart below identifies invoices which included travel expenses that Plaintiffs did not receive approval for or that violated applicable travel policies.

| Invoiced Travel | | | | |
|---|---|---|---|---|
| No. | Vendor | Invoice | Date | Amount |
| 1. | STILUS LLC | 1031 | 06/24/21 | $609.51 |
| 2. | STILUS LLC | 1033-4 | 08/09/21 | $2,781.08 |
| 3. | STILUS LLC | 1038 | 10/16/21 | $336.00 |
| 4. | STILUS LLC | 1035 | 10/18/21 | $321.80 |
| 5. | STILUS LLC | 1037 | 10/18/21 | $717.56 |
| 6. | STILUS LLC | 1044 | 11/22/21 | $79.56 |
| 7. | STILUS LLC | 1046 | 11/22/21 | $1,463.31 |
| 8. | STILUS LLC | 1045 | 11/25/21 | $420.65 |
| 9. | STILUS LLC | 1048 | 12/20/21 | $597.30 |
| 10. | STILUS LLC | 1049 | 12/20/21 | $2,031.34 |
| 11. | STILUS LLC | 1052 | 12/20/21 | $3,308.82 |
| 12. | STILUS LLC | 1054 | 02/07/22 | $578.88 |
| 13. | STILUS LLC | 1057/2022 | 02/28/22 | $1,034.78 |
| 14. | STILUS LLC | 1055/2022 | 03/04/22 | $1,533.32 |
| 15. | STILUS LLC | 1060/2022 | 05/10/22 | $1,823.15 |
| 16. | STILUS LLC | 1061/2022 | 05/10/22 | $555.22 |
| 17. | STILUS LLC | 1062/2022 | 06/10/22 | $47.25 |
| 18. | STILUS LLC | 1064/2022 | 07/19/22 | $3,719.76 |
| 19. | STILUS LLC | 1065/2022 | 08/19/22 | $480.07 |

| Invoiced Travel | | | | |
|---|---|---|---|---|
| No. | Vendor | Invoice | Date | Amount |
| 20. | STILUS LLC | 1069/2022 | 10/04/22 | $426.99 |
| 21. | STILUS LLC | 1071/2022 | 10/12/22 | $1,056.99 |
| 22. | STILUS LLC | 1073/2022 | 11/04/22 | $1,088.84 |
| 23. | STILUS LLC | 1076/2022 | 12/01/22 | $2,293.33 |
| 24. | STILUS LLC | 1078/2023 | 01/03/23 | $1,727.63 |
| TOTAL | | | | $29,033.14 |

84.     The chart below identifies the travel related expenses that Defendants improperly

charged to the company credit card.

| Credit Card Travel | | | | |
|---|---|---|---|---|
| No. | Vendor | Merchant | Date | Amount[3] |
| 1. | STILUS LLC | CIPRIANI DOWNTOWN | 12/09/21 | $210.02 |
| 2. | STILUS LLC | PARK LANE HOTEL | 12/10/21 | $4,326.29 |
| 3. | STILUS LLC | Marina Bernried | 01/13/22 | $700.46 |
| 4. | STILUS LLC | CMT UK LTD TAXI FARE | 02/07/22 | $11.09 |
| 5. | STILUS LLC | Scarlett Green | 02/07/22 | $57.62 |
| 6. | STILUS LLC | HILTON HOTELS | 02/07/22 | $607.04 |
| 7. | STILUS LLC | WILDING OXFORD | 02/07/22 | $556.13 |
| 8. | STILUS LLC | MALMAISON OXFORD | 02/08/22 | $699.68 |
| 9. | STILUS LLC | PARKHAUS FLUGHAFEN | 02/09/22 | $230.54 |
| 10. | STILUS LLC | Hilton International Hotel | 02/10/22 | $54.28 |
| 11. | STILUS LLC | HILTON HOTELS | 02/10/22 | $659.62 |
| 12. | STILUS LLC | Hilton International Hotel | 02/10/22 | $248.98 |

---

[3]   The amounts reflected in this chart have been converted to U.S. Dollars from British Pounds
or Euros, as applicable.

| Credit Card Travel | | | | |
|---|---|---|---|---|
| No. | Vendor | Merchant | Date | Amount[4] |
| 13. | STILUS LLC | SOHO GRAND HOTEL | 02/22/22 | $300.92 |
| 14. | STILUS LLC | CURB SVC MIAMI | 02/23/22 | $63.21 |
| 15. | STILUS LLC | SOHO GRAND HOTEL | 02/23/22 | $13.82 |
| 16. | STILUS LLC | CURB SVC MIAMI | 03/30/22 | $62.10 |
| 17. | STILUS LLC | AMERICAN AIR0010261277999 | 04/02/22 | $27.80 |
| 18. | STILUS LLC | FAIRMONT HAMILTON LODGE | 04/02/22 | $1,838.26 |
| 19. | STILUS LLC | FAIRMONT HAMILTON LODGE | 04/02/22 | $5.91 |
| 20. | STILUS LLC | REUNION KITCHEN BAR | 04/13/22 | $239.91 |
| 21. | STILUS LLC | TECK PAY | 04/13/22 | $88.23 |
| 22. | STILUS LLC | CURB SVC MIAMI | 04/28/22 | $64.25 |
| 23. | STILUS LLC | HILTON JFK AIRPORT | 04/29/22 | $248.37 |
| 24. | STILUS LLC | JOEYS WYNWOOD | 04/29/22 | $367.46 |
| 25. | STILUS LLC | PARKRECEIPTS.COM -V | 05/01/22 | $52.34 |
| 26. | STILUS LLC | SEXY FISH MIAMI | 05/02/22 | $591.14 |
| 27. | STILUS LLC | RITZ-CARLTON, MONTREAL | 06/19/22 | $1,052.05 |
| 28. | STILUS LLC | Gasthof Hubmann, 87 | 07/08/22 | $309.41 |
| 29. | STILUS LLC | MALMAISON OXFORD | 07/13/22 | $758.74 |
| 30. | STILUS LLC | COURTYARD BY MARRIOTT OXF | 07/13/22 | $518.02 |
| 31. | STILUS LLC | LEONARDO HEATHROW FRONT D | 07/13/22 | $232.58 |
| 32. | STILUS LLC | LEONARDO HEATHROW FRONT D | 07/14/22 | $232.58 |

---

[4]   The amounts reflected in this chart have been converted to U.S. Dollars from British Pounds or Euros, as applicable.

| Credit Card Travel | | | | |
|---|---|---|---|---|
| **No.** | **Vendor** | **Merchant** | **Date** | **Amount**[4] |
| 33. | STILUS LLC | SQ *THE FOLLY | 07/14/22 | $1,258.73 |
| 34. | STILUS LLC | SUMUP *TAXIUNTERNEHMEN R | 07/18/22 | $107.30 |
| 35. | STILUS LLC | VICTORS OXFORD | 07/28/22 | $635.08 |
| 36. | STILUS LLC | PEPOLINO RISTORANTE | 08/01/22 | $148.55 |
| 37. | STILUS LLC | Greyhound, Besselsleigh | 10/11/22 | $781.16 |
| **TOTAL** | | | | **$18,359.68** |

85.     Despite attempts from the audit team to work with Defendants to resolve the discrepancies with respect to the invoices and credit card charges, minimal cooperation from Defendants was provided.  At one point, Schwarz even argued that she could not provide any documentation regarding third-party or vendor expenses because of German intellectual property law—an argument for which she provided no support and as a non-lawyer, is not qualified to assert.

86.     Defendants were provided ample opportunity to remedy the deficiencies relating to the invoices and credit card charges, but failed to provide the audit team with helpful information or documentation sufficient to demonstrate that the charges in the invoices were accurate and appropriate.

87.     In total, Defendants overbilled and improperly charged Plaintiffs for over $6.9 million.

88.     Defendants' fraudulent scheme to overbill and improperly charge Plaintiffs was wilful and wanton and completed with the malicious intent to both harm Plaintiffs and generate an improper monetary windfall for Defendants.

**I.      WIPH Terminates The WIPH Agreement**

89.     On March 22, 2023, WIPH provided Schwarz with notice of WIPH's intent to terminate the WIPH Agreement.  The notice identified multiple material breaches of the WIPH Agreement as the basis for termination, including that Defendants failed to abide by the highest professional behavior, could not provide sufficient documentation to support the accuracy of fees and expenses Defendants charged Plaintiffs, and the significant harm to Plaintiffs' brand, image and reputation caused by Defendants' conduct.  In addition, due to Defendants' material breaches of the WIPH Agreement, the termination letter provided notice of WIPH's intent to terminate Quote 1299.

90.     Section 23.2 of the WIPH Agreement provides that a legal proceeding alleging a breach of the agreement may not be commenced until 21 days after notice of the alleged breaches is provided, and that notice is deemed to be received three days from the date of mailing of the notice.   Following mailing of the notice of the alleged breaches and during the 21-day waiting period, the parties are to attempt to negotiate a resolution.

91.     On April 6, 2023, Plaintiffs sent a letter to Defendants and Defendants' counsel via email and Federal Express, which notified Defendants that Plaintiffs possessed viable claims against Defendants based on, among other things, Defendants' breach of WIPH Agreement.  The letter further stated that it was providing notice of the breach claims pursuant to Section 23 of the WIPH Agreement.

92.     Plaintiffs have attempted to settle their claims and disputes with Defendants, but the parties were unable to reach a consensual resolution.

93.     This Complaint has been filed more than 21 days after notice of breach was provided to Defendants.

**FIRST CAUSE OF ACTION**
**Breach of Dorilton Agreement**
**(Against Stilus)**

94.     Plaintiffs restate and incorporate by reference the allegations contained in the foregoing paragraphs as if fully stated herein.

95.     A valid contract exists between the parties.  On March 10, 2022, Stilus entered into a Consulting Agreement with Dorilton, with an effective date of November 1, 2021.

96.     At all times, Dorilton performed its contractual obligations in accordance with the Dorilton Agreement.

97.     Stilus has failed to perform its contractual obligations under the Dorilton Agreement and has materially breached the Dorilton Agreement by, *inter alia*:

      a.     failing to perform services in good faith and in a manner compliant with best industry practices;

      b.     failing to render services in accordance with the highest professional standards;

      c.     engaging in unprofessional conduct in the workplace, including bullying and harassment of employees;

      d.     engaging in inappropriate and unauthorized communications with the media;

      e.     making misleading statements to the media;

      f.     submitting invoices for payment that lacked supporting documentation and/or sought payment for services that were not actually performed; and

      g.     submitting requests for reimbursement of unapproved expenses.

98.     As a direct, proximate, and foreseeable result of Stilus's material breaches, Stilus has caused damage to Dorilton.  Dorilton seeks compensatory and punitive damages, interest and costs, and any other relief the Court deems just and proper.

**SECOND CAUSE OF ACTION**
**Breach of WIPH Agreement**
**(Against Stilus)**

99.     Plaintiffs restate and incorporate by reference the allegations contained in the foregoing paragraphs as if fully stated herein.

100.    A valid contract exists between the parties.  On January 1, 2022, WIPH and Stilus executed a Public Relations Consultancy Agreement.

101.    At all times, WIPH performed its contractual obligations in accordance with the WIPH Agreement.

102.    Stilus has failed to perform its contractual obligations under the WIPH Agreement and has materially breached the WIPH Agreement by, *inter alia*:

    a.     failing to perform services with reasonable skill and care;

    b.     failing to perform services to a standard to be reasonably expected from a competent and professional supplier of public relations services;

    c.     failing to abide by the highest professional behavior;

    d.     engaging in unprofessional conduct in the workplace, including bullying and harassment of employees;

    e.     engaging in inappropriate and unauthorized communications with the media;

    f.     making misleading statements to the media;

g.    submitting invoices for payment that lacked supporting documentation and/or sought payment for services that were not actually performed;

h.    submitting requests for reimbursement of unapproved expenses; and

i.    refusing to immediately account to WIPH for the overpayments identified during the audit.

103.    As a direct, proximate, and foreseeable result of Stilus's material breaches, Stilus has caused damage to Plaintiffs.  Plaintiffs seek compensatory and punitive damages, interest and costs, including costs of the audit, and any other relief the Court deems just and proper.

**THIRD CAUSE OF ACTION**
**Breach of Implied Covenant of Good Faith and Fair Dealing**
**(Against Stilus)**

104.    Plaintiffs restate and incorporate by reference the allegations contained in the foregoing paragraphs as if fully stated herein.

105.    Under New York law, every contract entered into in the state contains an implied covenant to act in good faith and to deal fairly with the other party to the contract.

106.    At all times, Plaintiffs fulfilled their contractual obligations in accordance with the Dorilton Agreement and the WIPH Agreement.

107.    Stilus has failed to perform its contractual obligations under the Dorilton Agreement and the WIPH Agreement, and has materially breached the covenant of good faith and fair dealing through its many violations of the Dorilton Agreement and the WIPH Agreement.

108.    Stilus failed to provide the services that it was contracted to provide in a professional and satisfactory manner.

109.    Stilus injured Plaintiffs' reputation and created poor, unusable work product, and improperly extracted over $6.9 million from Plaintiffs via a fraudulent scheme of overbilling, over-expensing, and improperly charging Plaintiffs.

110.    As a direct, proximate, and foreseeable result of Stilus's material breaches, Stilus has caused damage to Plaintiffs.  Plaintiffs seek compensatory and punitive damages, interest and costs, and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
**Fraud**
**(Against Stilus)**

111.    Plaintiffs restate and incorporate by reference the allegations contained in the foregoing paragraphs as if fully stated herein.

112.    Stilus wilfully and knowingly made false and fraudulent statements of material fact to Plaintiffs and concealed material facts from Plaintiffs in the course of submission of dozens of fraudulent invoices and credit card charges seeking payment from Plaintiffs.

113.    Stilus overbilled, over-expensed, and improperly charged Plaintiff for a total sum of more than $6.9 million.  Stilus submitted dozens of invoices that lacked sufficient support to evidence the accuracy of the fees and expenses, contained fees and expenses for which Defendants failed to obtain the required approval, and/or contained travel expenses that were either not authorized or in contravention of applicable travel policies.

114.    Stilus also charged dozens of travel expense-related charges on a company credit card that lacked sufficient approval or violated travel policy.

115.    Stilus submitted invoices and completed the improper credit card charges with the knowledge that they did not adhere to the terms of the contracts or company policy and did not accurately reflect the services provided to Plaintiffs.

116.    Plaintiffs reasonably relied on the accuracy of the invoices and credit card charges submitted by Stilus.

117.    An audit conducted by Plaintiffs identified:  (1) 57 invoices, submitted from February 2021 to January 2023, that contained fees and expenses totalling over $6.8 million that lacked sufficient documentation to verify the charged-for work and expenses were accurate; (2) 27 invoices that contained fees and expenses totalling over $1.8 million that lacked signed pre-approvals; (3) 24 invoices that contained travel expenses totalling over $29,000 that violated the terms of the agreements or applicable travel policies; and (4) 37 travel expense-related charges on a company credit card that lacked sufficient approval or violated travel policy.

118.    As a direct, proximate, and foreseeable result of Stilus's conduct, Plaintiffs have sustained losses and monetary damages of over $6.9 million.

119.    Plaintiffs are entitled to compensatory and punitive damages, interest and costs, and any other relief the Court deems just and proper.

### FIFTH CAUSE OF ACTION
**Aiding and Abetting Fraud**
**(Against Schwarz)**

120.    Plaintiffs restate and incorporate by reference the allegations contained in the foregoing paragraphs as if fully stated herein.

121.    Stilus engaged in a fraudulent scheme in which it received over $6.9 million from the Plaintiffs in overbilled and improperly charged fees and expenses.

122.    Schwarz knowingly aided and abetted Stilus's fraudulent scheme.

123.    Schwarz's conduct in furtherance of the fraudulent scheme is significant and material.  She had complete knowledge of the fraudulent scheme and acted with malicious intent to deprive Plaintiffs of their property.  As CEO of Stilus, Schwarz was responsible for overseeing the work performed for Plaintiffs and for directing the submission of invoices and

completion of company credit card charges.  Schwarz instructed Stilus to provide vague and misleading descriptions in its invoices and inflated the true cost of the services allegedly provided to the Plaintiffs.  Schwarz knowingly induced Plaintiffs to provide full payment of the false invoices and improper credit card charges.

124.    Schwarz took active steps to ensure the overbilling and improper charging scheme remained hidden from Plaintiffs.  She did not seek pre-approval for certain services and expenses.  She did not maintain or disclose supporting documentation for the invoices and credit card charges.  And she did not cooperate with Plaintiffs' audit.

125.    Schwarz also used her position as interim CMO and her inappropriate relationship with Fultz to further her scheme.  Fultz was one of the individuals authorized to approve Stilus's invoices and company credit card charges.  Schwarz made sure that employees knew that if they objected to one of her invoices or credit card charges, she would go over their head to Fultz.  Many employees felt they could not question Schwarz about her invoices or credit card charges out of fear that she would convince Fultz to fire them.

126.    Schwarz's actions indicate a clear intention to further Stilus's fraud and conceal the invoicing and improper charging scheme.

127.    As a direct, proximate, and foreseeable result of Schwarz's conduct, Plaintiffs have sustained losses and monetary damages in the sum of over $6.9 million.

128.    Plaintiffs are entitled to compensatory and punitive damages, interest and costs, and any other relief the Court deems just and proper.

## SIXTH CAUSE OF ACTION
**Unjust Enrichment**
**(Against Stilus and Schwarz)**

129.    Plaintiffs restate and incorporate by reference the allegations contained in the foregoing paragraphs as if fully stated herein.

130.    Defendants were unjustly enriched at Plaintiffs' expense as a result of Defendants' overbilling and improper charging scheme.

131.    By paying the invoices, Plaintiffs conferred a benefit on Defendants.  Plaintiffs either paid Defendants directly or covered expenses claimed by the Defendants.  The benefit Defendants received was over $6.9 million.

132.    Defendants were enriched at Plaintiffs' expense.  Defendants were not contractually or legally entitled to the amounts that they overbilled and improperly charged Plaintiffs.

133.    Plaintiffs suffered a financial loss due to Defendants' conduct.  When paying the invoices and improper credit card charges, Plaintiffs reasonably expected that the invoices and charges reflected fees and expenses that were legitimately owed to Defendants.  Instead, Defendants overbilled Plaintiffs for millions of dollars.  Plaintiffs were not aware that the invoices and credit card charges were inflated because of Defendants' fraud and ongoing concealment.

134.    Pursuant to Section 12.1 of the WIPH Agreement, Defendants were required to immediately return any overpayments identified in the audit.  Defendants have refused to do so, and have kept the overpayments for themselves.

135.    Because Defendants were unjustly enriched by millions of dollars, equity and good conscience requires restitution to Plaintiffs.

136.    Plaintiffs are entitled to compensatory and punitive damages, interest and costs, and any other relief the Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter an order and judgment against Defendants as follows:

a.   Awarding Plaintiffs actual and compensatory damages;

b.   Declaring that the Dorilton Agreement and the WIPH Agreement have been terminated, with no additional monies due to Stilus due to Stilus's breach;

c.   Awarding punitive damages;

d.   Awarding reasonable attorneys' fees and expenses;

e.   Awarding Plaintiffs the costs of the audit;

f.   Awarding costs of this action;

g.   Awarding pre-judgment and post-judgment interest; and

h.   Awarding Plaintiffs such other and further relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a jury trial for all issues so triable.

Dated: May 4, 2023                                  Respectfully submitted,
      New York, New York

                               */s/ Gabrielle Levin*

Gabrielle Levin
Salah Hawkins
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, NY 10166
Tel:  212-351-4000
Fax:  212-351-4035

*Attorneys for Dorilton Capital Management*
*LLC and Williams IP Holdings LLC*